IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| AMY TEGLEY, | ) | 4:13CV3104 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM |
| v. | ) | AND ORDER |
| | ) | |
| LANCASTER COUNTY, | ) | |
| NEBRASKA, | ) | |
| | ) | |
| Defendant. | ) | |

Amy Tegley was separated from her employment with Lancaster County, Nebraska, in December 2011 after the County Treasurer determined that migraine headaches prevented Tegley from performing the essential functions of her job as a motor vehicle clerk. Tegley contends in this action that she was discriminated against on the basis of disability and denied reasonable accommodations in violation of the Americans With Disabilities Act (ADA), and that she was actually discharged for exercising her rights under the ADA and the Family and Medical Leave Act (FMLA).

The County has moved for summary judgment on all claims. For the reasons discussed below, the motion will be granted and judgment will be entered dismissing all claims with prejudice.

### I. Undisputed Facts

Our local rules provide that "[t]he moving party must include in the brief in support of the summary judgment motion a separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." NECivR 56.1(a)(1). "The statement of facts should consist of _short_ numbered paragraphs, each containing pinpoint

references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials that support the material facts stated in the paragraph." NECivR 56.1(a)(2) (emphasis in original). The party opposing a summary judgment motion must then include in its brief a concise response to the moving party's statement of material facts. "Each material fact in the response must be set forth in a separate numbered paragraph, must include pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies, and, if applicable, must state the number of the paragraph in the movant's statement of material facts that is disputed." NECivR 56.1(b)(1). "Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response." Id. (emphasis in original).

Each party has generally complied with these briefing requirements. For the most part, Tegley does not dispute the County's statement of material facts. Similarly, the County does not dispute most of the additional facts which Tegley has set out in her opposing brief, although it does not concede their materiality.[1]

Based on the parties' respective statements, and a review of the referenced exhibits, the court finds there is no genuine dispute as the following facts:[2]

_____

[1] The County states in its reply brief that, subject to one exception, it "does not dispute the supplemental facts contained in Plaintiff's brief as almost all of those facts were contained in the exhibits" (filing 24 at 1). The County disputes that the County Treasurer made a disparaging statement about employees taking FMLA leave.

[2] Paragraphs 1 through 34 are derived from the County's statement of material facts (filing 13 at 1-5), but Tegley's opposing brief is the source for all lettered subparagraphs (filing 21 at 2-16). Paragraphs 35 though 40 are also taken from Tegley's opposing brief (filing 21 at 16-17). For readability, the parties' references to exhibits have been omitted.

1. Tegley was hired to work as a Motor Vehicle Clerk in the Lancaster County, Nebraska Treasurer's Office in 2006.

2. Tegley only worked as a Motor Vehicle Clerk during her time employed by The County.

3. Tegley's job duties as a Motor Vehicle Clerk included public contact[3] and reviewing paperwork submitted to the Treasurer's Office by car dealers or car buyers and verifying that the paperwork submitted contained the accurate tax information and entering that information into a computer.

4. Tegley was also expected to process the registrations and license plates for motor vehicles, collect the appropriate taxes for those vehicles, and if necessary handle the cash or credit card transaction.

5. All of these tasks are performed while the clerk is either standing or sitting at a service counter while dealing face-to-face with a customer at the County Treasurer's Office locations.

6. Tegley began experiencing migraine headaches while she was in high school.

7. Until 2007 or 2008, Tegley had success in managing her migraines through the use of over-the-counter Excedrin.

8. Beginning in 2007 or 2008, the nature of the headaches changed to the extent that Tegley would lose her vision, her arms would become numb and she would

---

[3] The County states there was "considerable" public contact, but Tegley objects to this characterization. Tegley did testify she had "a lot of face-to-face interactions" when registering motor vehicles and issuing license plates (filing 12-1 at 14).

experience severe nausea for a period of time between 12 hours and as much as four days.

8a. Tegley's lack of vision was in the left eye; Tegley's arm numbness did not prohibit her from using her arm, and there was no worry about dropping anything.

9. These migraines tended to last two to three days on average and "couldn't be managed at all."[4]

10. Typically the post-2007 migraines would begin in the middle of the night and cause Tegley to vomit and return to bed until the migraines would subside.

11. During the time in which Tegley suffered from the debilitating migraines, her doctors prescribed "anything and everything" to treat the migraines.

12. In addition to medications, Tegley tried chiropractic care, massage and allergy treatments to attempt to prevent or treat the migraines.

13. The medications "sometimes" provided relief,[5] but none of the other treatments worked; near the end of her employment with The County, Tegley began taking a new medication which "after four months did seem to break the cycle."

13a. Tegley had difficulty getting someone assigned to cover her station so she could go in the back for a few minutes to take her medication.

---

[4] Tegley testified some of the headaches were "not quite as light sensitive" and "[s]ometimes the nausea [was] not involved" (filing 12-1 at 47).

[5] Tegley had shots which she could carry with her; if those did not work, Tegley would go to Dr. Fisher's office and be injected with three different medications, which did not always work either (filing 12-1 at 18).

13b. Not all of Tegley's migraines from 2007 to 2011 were "severe."

13c. Tegley was able to work if she was not having a severe migraine.

14. In 2009, Tegley was taking intermittent leave under the Family and Medical Leave Act of 1993 because of her migraines, which at the time she considered to be a serious health condition that rendered her unable to perform the essential functions of her position.

15. In March 2011, Tegley requested to move her service window to a location underneath a skylight window so that she would be removed from the "backroom drama" and to see if the natural light would help her migraines.

15a. Tegley thought being under the skylight would help with her headaches because Fluorescent lighting has been statistically proven to cause tension headaches and migraines. Tegley believed it would be less stress on the eyes.

15b. Tegley requested the seating under the skylights because her doctor had suggested no fluorescent lighting, and the only option to attempt to achieve that would be the skylight.

15c. The skylights are big enough to cover two workstations and provide the only direct overhead lighting for those stations.

15d. Tegley did research on her own and discussed with her doctor various medical and other alternatives to mange and reduce her headaches.

16. Tegley was assigned to that location for about a month before she was inexplicably reassigned. Tegley could not determine whether the location under the skylight provided any relief to her headaches in that amount of time.

-5-

16a. Tegley did not feel that she was placed under the skylight long enough to give it a fair trial.

17. Upon being moved from the skylight position, Tegley did not voice any objection to the office scheduler.

17a. Tegley did not feel that she was going to receive any cooperation from the management following her removal from the skylight station.

17b. Tegley did not feel that she had been unreasonable in asking to be placed under the skylight; she had been trying to work with the County at that time to develop a solution.

17c. Kathleen (Kacey) Walkowiak, was in charge of the seating assignments at the time Tegley was removed from skylight window.

17d. Tegley did not request to be put back under the skylight because she felt that Ms. Walkowiak did not respect the clerk's opinions and that as was typical for the office that Ms. Ross would just defer to Ms. Walkowiak on this matter as she routinely did on matters regarding clerks. Tegley did not wish to jeopardize her job.

17e. Windows were assigned based on competency, quickness and whether or not your supervisor liked you, but mostly on how much Mr. Walkowiak liked the person she was assigning and Tegley believed that Ms. Walkowiak did not like her.

17f. Matthew Hollins, Jerad Higley and Jody Groff, nondisabled employees, were allowed to remain in permanent stations and not be regularly moved.

18. In April 2011, Tegley was reprimanded for being absent without leave for taking a day off of work when she was experiencing the stomach flu.

18a. In March 2011, Andrew Stebbing approved a new sick leave policy for the County Treasurer's Office which included semiannual monitoring of sick leave usage of all employees.

18b. Stebbing took office as County Treasurer in January 2011.[6]

18c. The County did not fully apply the sick leave policy to Tegley and her sick leave was not reviewed "because her sick leave use was almost entirely FMLA leave."

18d. Despite not reviewing Tegley's sick leave per the new policy, Stebbing met with Tegley "to discuss her attendance issues" on or about March 3, 2011.

18e. Stebbing met with Tegley "to discuss her attendance issues while Tegley was on intermittent FMLA leave.

18f. Although Tegley's sick leave had not been reviewed "because her sick leave use was almost entirely FMLA leave," Tegley was disciplined for sick leave use under the new policy enacted.

19. On that day in April 2011, Tegley was absent without leave because she had used her available paid sick leave earlier in the pay period when she experienced a migraine.

19a. Tegley's migraine was an absence covered by the FMLA.

---

[6] Tegley testified that shortly after Stebbing took office, he held a meeting with all County Treasurer employees and stated he believed that sick leave and FMLA time were a waste of county time and money should cease (filing 12-1 at 64). The County denies this statement was made.

-7-

19b. Tegley was required to use her available sick leave for covered absences and was not allowed to reserve sick leave for non-FMLA qualifying absences per the County FMLA policy.

20. On or about August 1, 2011, Tegley received her annual evaluation for the year 2011 and received the highest score she had ever received on an annual evaluation during her employment with the County.

20a. At the time Stebbing wrote on Tegley's evaluation regarding her attendance, Tegley was approved for FMLA leave, and Tegley's absences were largely related to her FMLA usage.

20b. Throughout Tegley's performance she was always rated sufficiently at a minimum.

21. Tegley received a merit pay increase as a result of her passing her annual evaluation.

22. In November 2011, Tegley saw Dr. John Puente, a neurologist, whom she had heard from a friend had expertise in treating chronic migraines.

23. Tegley went to Dr. Puente in part because her migraines seemed to adapt to medications, which would stop working after a month or so.

23a. Tegley only saw Dr. Puente once.

23b. Tegley primarily saw Dr. Fischer for her migraines and Dr. Puente was working with Dr. Fisher to manage Tegley's migraines.

24. In or about November 2011, Tegley met with Lancaster County Treasurer Andy Stebbing and her division manager, Susan Ross, to discuss her migraines and

whether there were any accommodations that would allow her to work while she was dealing with these headaches. At that meeting, the only accommodation Tegley requested was use of a chainsaw to cut off her head.

25. In the same meeting, Tegley gave Stebbing authorization to contact Dr. Puente.

25a. Tegley offered to provide a medical release of information for the County to obtain medical information from Dr. Fischer as well, but Stebbing refused Tegley's offer.

26. Dr. Puente provided Stebbing "some initial information" regarding Tegley's condition on November 23, 2011. In response to Stebbing's request for information, opinions, and recommendations about Tegley's diagnosis, functional limitations, need for accommodations, and ability to perform the essential functions of her job, Dr. Puente stated, "I am not sure I am the appropriate one to ask these questions, as our encounter was just an initial evaluation and I do not think I am prepared to tell you what her prognosis or response to medicine is, as her workup is in progress." He indicated, however, that "[a]t this time, her headache is considered chronic idiopathic; meaning, no clear cause; with a migraine component," that she does not have functional limitations unless she has a headache, that "[i]f she does have one of her headaches, they tend to be debilitating and she will likely have to be relieved from duty," that there was no specific need for job accommodation "other than the fact that at times she will need time off due to her headaches unless they are under better control," and that her prognosis was "quite guarded."

26a. The County relied on Dr. Puente's documentation, rather than requesting any additional information in determining that Tegley's employment should be separated.

27. Following exhaustion of Tegley's statutory leave time under FMLA, Stebbing allowed Tegley to take leave without pay in order to provide her with additional time to manage her migraines.

27a. Tegley was notified of the expiration of her FMLA leave on November 4, 2011, approximately 42 days prior to her termination.

28. Tegley was granted approved leave without pay on November 3, 4, 9, 10, 14, 18, 21 and 28 of 2011.

29. During this period of approved leave without pay, Tegley's headaches continued to be debilitating and incapacitating to the point that Tegley could not perform any activities other than lying in bed until the migraine subsided.

30. On or about November 2011, Tegley submitted a completed application for long-term disability benefits to Hartford Life Insurance Company because she believed she could not work for periods of time due to her migraines.

31. In addition to the days of leave without pay, Tegley was also absent from work on November 29, 2011, and December 1, 2, 5, 6 and 7 of 2011.

32. On December 6, 2011, Stebbing provided Tegley with a letter which indicated his intent to separate her employment from Lancaster County because she could not perform the essential functions of her position and set a time for a meeting to discuss whether any reasonable accommodations would allow her to perform the essential functions of her position.

33. During the pre-separation meeting held on December 14, 2011, Tegley requested additional leave time to determine whether a new medication she had been prescribed would alleviate her headaches.

-10-

33a. At the beginning of the meeting, and several times throughout the meeting, County Treasurer, Andy Stebbing, stated that the meeting was not a disciplinary meeting, and made it clear it was a "Disability Meeting."

33b. Stebbing announced that the purpose of the meeting was discuss whether there were accommodations that could be put in place because of Tegley's disability. Stebbing made several references to Tegley's disability and gave indications that he regarded her as disabled.

33c. During the meeting, Rebecca Bolli, Tegley's union representative suggested, as an accommodation, that Tegley be allowed to work in the mail room so that if she was experiencing a migraine that she would not have to leave customer[s] in order to deal with the possible side effects, like nausea.

33d. Bolli suggested the assignment in the mail room as an accommodation because it would not interfere with the work of the other clerks and would be easily accessible for Tegley to go be sick if she were experiencing nausea related to a migraine.

33e. Bolli worked with Tegley at the Treasurer's office and was familiar with layout and the operation of the office, and knew that placement of Tegley in the mail room would not produce an increased burden on the other clerks, as some clerks are already assigned only to windows and the floating staff who perform non-customer duties regularly are only utilized when the customer need is sufficient to warrant additional employees being placed at customer windows.

33f. At the meeting, Tegley discussed how she had recently seen Dr. Puente for the first time and that they were working on managing the correct dosage of a new migraine medication but that it could take a few days for a new dosage to be effective.

33g. Tegley explained how she was also working with Dr. Fischer and he was managing the dosage of the new medication.

33h. During the meeting, Tegley's counsel and Bolli requested that Tegley be given a short amount of time, an additional 30-60 days, to allow to determine if the new medication was going to be effective in managing Tegley's migraines.

33i. It was made very clear that Tegley was not requesting an indefinite amount of time to determine if the new medication was going to be effective, but a short 30-60 day time period before a decision was made regarding her termination.

33j. Stebbing indicated that he was going to consider whether or not the county was willing to provide the accommodations requested and listed both accommodations that had been requested during the meeting.

34. On December 15, 2011, Stebbing elected to separate Tegley's employment with the County because the only accommodation requested by Tegley which would potentially allow her to perform the essential functions of her position was indefinite leave time to determine if a new medication would alleviate her headaches. Stebbing could not grant indefinite leave due to the operational needs of his office.[7]

35. The County stated that "it should be pointed out, that in total, Ms. Tegley was absent from work 51 of the 109 workdays preceding the interactive meeting on December 14, 2011."

36. Tegley no longer experiences severe headaches, they are manageable with over the counter migraine medication again.

---

[7] Although Stebbing may have understood Tegley to be requesting "indefinite leave time," Tegley has presented evidence that her attorney and union representative only asked for 30-60 additional days.  The County has not refuted this evidence.

37. Tegley's migraines became more manageable again when the medication Tegley began near the time of her termination had time to build up, and the migraines had pretty much subsided by February.

38. Tegley provided medical documentation to Defendant throughout the time of Tegley's FMLA leave.

39. The County perceived Tegley as disabled because of the doctor's notes provided by Tegley.

40. Tegley requested accommodations in order to better manage her headaches and to be able to take less leave.

## II. Discussion

"Summary judgment will only be granted if the evidence shows 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Branch v. Gorman*, 742 F.3d 1069, 1071 (8th Cir. 2014) (quoting Fed.R.Civ.P. 56(c)).[8] "When ruling on a summary judgment motion, 'a court must view the evidence in the light most favorable to the nonmoving party.'" *Id.* (quoting *Roers v. Countrywide Home Loans Inc.*, 728 F.3d 832, 835 (8th Cir. 2013). "However, in order to avoid summary judgment, the nonmoving party must 'come forward with specific facts showing that there is a genuine issue for trial.'"

---

[8] An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Heacker v. Safeco Ins. Co. of America*, 676 F.3d 724, 727 (8th Cir. 2012). "As to materiality, the substantive law will identify which facts are material...." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

*Barnhardt v. Open Harvest Co-op.*, 742 F.3d 365, 369 (8th Cir. 2014) (quoting *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 886 (8th Cir. 2013)). "The nonmoving party may not rely on mere speculation or conjecture." *Bayside Holdings, Ltd. v. Viracon, Inc.*, 709 F.3d 1225, 1228 (8th Cir. 2013).

### A. FMLA Claim

"Under [the] FMLA, eligible employees are entitled to take leave from work for certain family or medical reasons, including a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Jackson v. City of Hot Springs*, 751 F.3d 855, __, 2014 WL 1876129, *3 (8th Cir. 2014) (quoting *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 864-65 (8th Cir. 2006)). Although the parties characterize Tegley's FMLA claim as a "retaliation" claim arising under 29 U.S.C. § 2615(a)(2) (which makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]"), in truth it is a "discrimination" claim arising under 29 U.S.C. § 2615(a)(1) (which makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the Act]"). *See Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005-06 (8th Cir. 2012).[9]

"[A]n employer may not consider an employee's use of FMLA leave as a negative factor in an employment action. " *Jackson*, 2014 WL 1876129 at *3 (quoting *Hite*, 446 F.3d at 865 (internal quotations omitted)). "Basing an adverse employment action on an employee's use of leave ... is therefore actionable." *Id.* (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002)). "An employee making this

---

[9] A third type of FMLA claim is an "entitlement" claim, which also arises under 29 U.S.C. § 2615(a)(1). This type of claim "occurs where an employer refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the Act." *Pulczinski*, 691 F.3d at 1005. Tegley does not assert an "entitlement" claim.

type of claim must prove that the employer was motivated by the employee's exercise of rights under the FMLA." *Pulczinski*, 691 F.3d at 1006. "This proof may come from direct evidence or indirect evidence using the *McDonnell Douglas*[10] burden-shifting framework." *Brown v. City of Jacksonville*, 711 F.3d 883, 891 (8th Cir. 2013).

### 1. Direct Evidence

Direct evidence includes "conduct or statements by persons involved in the decision-making process, which indicate a discriminatory attitude was more likely than not a motivating factor in the employer's decision." *Id.* at 893 n. 11 (quoting *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1046 (8th Cir. 2005)). "Thus, 'direct' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004).

Tegley claims there is direct evidence Stebbing acted with discriminatory intent in terminating her employment because, shortly after taking office in early January 2011, he told employees in the County Treasurer's Office "he believed that sick leave and FMLA was a waste of county time and money and he wanted to see it cease" (filing 12-1 at 64, 66). While denying that Stebbing said these words,[11] the County argues that such a statement would fall under the category of "stray remarks" because it allegedly was made almost a year before Tegley's employment was terminated and was unrelated to the decisional process. The County also argues that the alleged statement has become stale as evidence of discriminatory intent because Stebbing subsequently included a provision in the new sick leave policy that "[t]he Lancaster County Treasurer's Office will comply with the rules and regulations of the Family and Medical Leave Act of 1993 and the County's policy that governs the application

---

[10] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[11] Tegley testified "to the best of [her] memory," but indicated the statement she attributed to Stebbing was "not verbatim" (filing 12-2 at 64).

of the Act" (filing 12-2 at 26) and excluded Tegley from the biannual reviews of employee sick leave usage.

The Eighth Circuit has held in several cases that when a statement evidencing discriminatory animus and an adverse employment action are not close in time, the plaintiff must present additional evidence to establish a causal link between the statement and the adverse employment action. *See, e.g., Brown*, 711 F.3d at 889 (ADA claim; plaintiff who walked with a cane because of hip problem allegedly was called "old woman" and "crip" by her supervisor 2 years before termination); *Bone v. G4S Youth Services, LLC*, 686 F.3d 948, 954 (8th Cir. 2012) (Title VII and ADEA claims; education director at youth correction center allegedly said 6 months before plaintiff's termination that "she did not want an old white lady in a suit doing recruiting"); *King v. United States*, 553 F.3d 1156, 1159 (8th Cir. 2009) (ADEA claim; selection committee members made statements in April 2003, February 2004, and September or October 2004 indicating they wanted to hire younger, educated people; plaintiff claimed she was not selected for a position in March 2005 because of her age); *Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1152 (8th Cir. 2007) (ADEA claim; 4 months prior to plaintiff's termination, sales vice president allegedly commented to persons not involved in the decisional process that he intended to hire "young studs" to replace older sales people); *Richardson v. Sugg*, 448 F.3d 1046, 1058-59 (8th Cir. 2006) (Title VII claim; racially offensive remarks allegedly were made by university athletic director 2 years before African-American basketball coach was fired); *Yates v. Douglas*, 255 F.3d 546, 549 (8th Cir. 2001) (Title VII claim; supervisor's racially offensive comments were made "approximately one to two years" before decision was made to terminate African-American plaintiff's employment); *Simmons v. Oce-USA, Inc.*, 174 F.3d 913, 915-16 (8th Cir. 1999) (Title VII claim; African-American plaintiff's supervisor allegedly uttered racial slur and repeated racially offensive joke 2 years before plaintiff was fired); *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 426-27 (8th Cir. 1999) (ADEA claim; 2 years before 54-year-old plaintiff's termination as part of a reduction in force, plaintiff's supervisor advised another older

-16-

employee to accept a transfer because if there was a RIF the supervisor would need to protect younger employees).

Tegley has not presented sufficient evidence to establish a causal link between the statement Stebbing allegedly made in early January 2011 and the decision he made in mid-December 2011 to terminate her employment. Tegley complains that in March 2011 she was counseled regarding the new sick leave rules (filing 12-5, ¶ 10) and in April 2011 was disciplined for taking a sick day unrelated to her serious health condition (filing 12-5, ¶19), but neither of those events were connected to her usage of FMLA leave. Tegley also complains that even though she was given her highest rated performance review and a merit increase in August 2011, Stebbing commented when approving her pay raise that "Amy's attendance at work is of great concern and should not be overlooked" (filing 12-2 at 37). Again, however, there is no indication that Stebbing was criticizing Tegley's use of FMLA leave. In fact, Stebbing further commented that "[d]uring this [performance review] period she was written up for being gone w/o leave" (filing 12-2 at 37). This comment directly relates to an observation that was made in the written evaluation by Tegley's supervisor, Susan Ross, who stated: "Amy's attendance is an issue due to the fact that she often times has no sick or vacation time accrued to use in an emergency. While the majority of Amy's absences are excused under FMLA, there have been some occurrences that were not. Amy needs to continue to work on her attendance issues" (filing 12-2 at 36).

Similarly, while Tegley claims that after she exhausted her available FMLA leave in November 2011, "Stebbing immediately commented on [her] attendance in a series of actions that ultimately led to her termination" (filing 21 at 24), the evidence shows that Stebbing's concern was that Tegley had also exhausted all of her paid sick leave and vacation time. When Stebbing wrote to Tegley on November 4, 2011, to inform her that she had no hours of FMLA leave remaining, he also advised her that under the sick leave policy she would need to make a written request for taking unpaid leave, which could be granted at the discretion of the department head. In addition, Stebbing stated he "would like to meet with [Tegley] to discuss her circumstances and

-17-

any requests for reasonable accommodation that [she] may have" (filing 12-5 at 23). Stebbing granted Tegley's request for leave without pay on November 9, 2011, and again expressed his desire to meet to discuss reasonable accommodation (filing 12-5 at 24). Stebbing also granted Tegley leave without pay on November 3, 4, 10, 14, 18, 21 and 28 of 2011. The meeting with Stebbing took place on November 22, 2011, but Tegley made no request for an accommodation and stated that nothing could be done (filing 12-5 at 3-4). Tegley was also absent from work on November 29, 2011, and December 1, 2, 5, 6 and 7 of 2011. On December 6, 2011, after receiving a report from Tegley's neurologist, Stebbing notified Tegley that he intended to separate her employment because she was unable to attend work on a regular and reliable basis, but he again offered to meet to discuss reasonable accommodation and scheduled a meeting for December 14, 2011 (filing 12-5 at 31). At this meeting, Tegley requested a period of 30-60 days to try a new medication. Stebbing concluded this was not a reasonable accommodation and, on December 15, 2011, notified Tegley that her employment was terminated (filing 12-5). None of these actions by Stebbing suggest that his alleged dislike for FMLA leave caused him to discharge Tegley.

Finally, Tegley notes that in March 2012, in responding to a charge of discrimination she filed with the Nebraska Equal Opportunity Commission, the County stated that "it should also be pointed out, that in total, Ms. Tegley was absent from work 51 of the 109 workdays preceding the interactive meeting on December 14, 2011" (filing 21-3 at 5-6). This statement is not an admission that Tegley was fired for taking FMLA leave, but, rather, it provides strong evidence that no reasonable accommodation was possible.[12]

_____

[12] As Stebbing states in his affidavit: "In separating Ms. Tegley's employment, I considered the fact that she had been absent for a considerable amount of days in the preceding year while she experimented with different medical treatments and that my office would not be able to reach its service objectives without placing a burden on my other employees" (filing 12-5, ¶ 27).

-18-

### 2. Indirect Evidence

To establish a prima facie case of retaliation, Tegley must show that (1) she engaged in protected conduct; (2) she suffered a materially adverse employment action; and (3) the materially adverse action was causally linked to the protected conduct. See *Chappell v. Bilco Co., 675 F.3d 1110, 1117 (8th Cir. 2012)*. If Tegley establishes a prima facie case, the burden shifts to the County to "promulgate a non-discriminatory, legitimate justification for its conduct," and then back to Tegley to "either introduce evidence to rebut the employer's justification as a pretext for discrimination, or introduce additional evidence proving actual discrimination." *Id.* (quoting *Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1111 (8th Cir. 2001)*).

"The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1087-88 (8th Cir. 2010)*, *abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031, 1043, 1058 app. (8th Cir. 2011)* (quoting *Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001)*). In *Smith*, the Eight Circuit found that an interval of "approximately one month" was too long to establish a prima facie case.  The same result was reached in *Wisbey v. City of Lincoln, 612 F.3d 667, 676 (8th Cir. 2010)*, *abrogated on other grounds by Torgerson, 643 F.3d at 1043, 1058 app.* (plaintiff did not present any evidence of causality "besides the fact that her termination occurred approximately one month after she submitted the FMLA application"). In the present case, 42 days elapsed between the date Tegley exhausted her FMLA leave and the date she was separated from her employment, and she even was permitted to take leave without pay for several days during this period.  It is not reasonable to infer from these facts that Tegley was terminated as a result of taking FMLA leave.

Even if Tegley could establish a prima facie case of discrimination, the County's evidence shows that she was terminated for a legitimate, non-discriminatory reason, namely, that Tegley was unable to perform an essential function of her job because her migraine headaches prevented her from maintaining regular and reliable attendance at work. Tegley argues this stated reason was pretextual, but she presents no evidence beyond that which has already been discussed above in connection with Stebbing's alleged January 2011 statement. And, as discussed, that evidence fully supports the County's position that Tegley's attendance issues were an ongoing problem. "[A] reason cannot be proved to be 'a pretext for *discrimination*' unless it is shown *both* that the reason was false, and that discrimination was the real reason." *Bone*, 686 F.3d at 955 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-16 (1993) (emphasis in original)). Because there is no genuine issue of material fact regarding the truthfulness of the County's stated reason for Tegley's discharge, her FMLA discrimination claim fails as a matter of law.

## B. ADA Claims

Tegley asserts both a failure-to-accommodate claim under 42 U.S.C. § 12112(a) (making it unlawful to "discriminate against a qualified individual on the basis of disability")[13] and a retaliation claim under 42 U.S.C. § 12203(a) (making it unlawful to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge,

---

[13] "As used in subsection (a) of [section 12112], the term 'discriminate against a qualified individual on the basis of disability' includes ... not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]" 42 U.S.C. § 12112 (5)(A).

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]").[14] There is not sufficient evidence to establish either claim.

### 1. Failure to Accommodate

The parties incorrectly characterize Tegley's claim under 42 U.S.C. § 12112(a) as alleging disparate treatment (*i.e.*, intentional discrimination). Tegley actually is claiming that the County failed to make reasonable accommodations as required by 42 U.S.C. § 12112 (5)(A).[15] Such a claim requires the application of a "modified burden-shifting analysis." *Fenney v. Dakota, Minnesota & E.R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003).

"Unlike disparate treatment claims, which require the use of the *McDonnell-Douglas* burden-shifting analysis to 'flesh[ ] out th[e] elusive factual question of intentional discrimination,' failure to accommodate claims do 'not turn on the employer's intent or actual motive.'" *Knutson v. Medtronic, Inc.*, Civ. No. 05-180, 2006 WL 1851142, *9 (D.Minn. 2006) (quoting *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004)). Instead, "the discrimination [underlying a failure to accommodate

---

[14] The Eighth Circuit "has held that a person who is terminated after unsuccessfully seeking an accommodation may pursue a retaliation claim under the ADA, if she had a good faith belief that the requested accommodation was appropriate." *Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013) (citing *Heisler v. Metro. Council*, 339 F.3d 622, 632 (8th Cir. 2003)).

[15] Tegley does allege that she was "regularly moved" while non-disabled employees were allowed to remain in permanent workstations (filing 1-1, ¶¶ 9-11), but this does not constitute an adverse employment action. *See Jackman v. Fifth Judicial Dist. Dept. of Correctional Services*, 728 F.3d 800, 804-05 (8th Cir. 2013) ("[M]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action."). Tegley's primary complaint in this connection is that she was not allowed to stay at the workstation under the skylight as an accommodation to her disability.

claim] is framed in terms of the failure to fulfill an affirmative duty–the failure to reasonably accommodate the disabled individual's limitations." *Id.* (quoting *Peebles, 354 F.3d at 767*). "The known disability triggers the duty to reasonably accommodate and, if the employer fails to fulfill that duty, [the court] does not care if [the employer] was motivated by the disability." *Id.* (quoting *Peebles, 354 F.3d at 767*).

Tegley "must first make a facial showing that [she] has an ADA disability and that [she] has suffered adverse employment action." *Fenney, 327 F.3d at 712*. Then Tegley "must make a facial showing that [she] is a 'qualified individual.'" *Id.* "To be a 'qualified individual' within the meaning of the ADA, an employee must '(1) possess the requisite skill, education, experience, and training for her position, and (2) be able to perform the essential job functions, with or without reasonable accommodation." *Heaser v. Toro Co., 247 F.3d 826, 830 (8th Cir. 2001)*, *abrogated on other grounds by Torgerson, 643 F.3d at 1043, 1058 app.* For purposes of the summary judgment motion, the County only disputes that Tegley was able to perform the essential functions of the job.

"Although the plaintiff retains the ultimate burden of proving that [she] is a qualified individual, if the employer disputes that the employee can perform the essential functions of the job, then the burden shifts to the employer to 'put on some evidence of those essential functions.'" *Fenney, 327 F.3d at 712* (quoting *Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1113 (8th Cir. 1995)*). "Further, if the employee cannot perform the essential functions of the job *without* an accommodation, [she] must only make a 'facial showing that a reasonable accommodation is *possible* ....'" *Id.* (quoting *Benson, 62 F.3d at 1112* (emphasis added)). "The burden of *production* [then] shifts to the employer to show that it is unable to accommodate the employee." *Benson*, *62 F.3d at 1112* (emphasis in original). "If the employer can show that the employee cannot perform the essential functions of the job even with reasonable accommodation, [then] the employee must rebut that showing with evidence of [her] individual capabilities." *Id.* "At that point,

-22-

the employee's burden merges with [her] ultimate burden of persuading the trier of fact that [she] has suffered unlawful discrimination." *Id.*

The County contends, and Tegley does not dispute, that Tegley was unable to perform the essential functions of her job because migraine headaches prevented her from attending work on a regular basis. It is also undisputed that the tasks of a motor vehicle clerk are performed while the clerk is either standing or sitting at a service counter while dealing face-to-face with a customer at the County Treasurer's Office locations. Tegley maintains, however, that the County could have accommodated her by (1) always having someone available to cover her workstation so she could go to the back room to inject herself with migraine medication; (2) assigning her to a service window under the skylight to see if natural light would reduce her migraines; (3) reassigning her to the mail room; and (4) not terminating her employment for 30-60 days to see if new medication would provide some relief.

The first three accommodations suggested by Tegley are not reasonable because the migraine headaches she was experiencing in 2011 typically began during the middle of the night and were so incapacitating that they would cause her to miss work for one or more days. Thus, there is no reason to conclude that her attendance issues would have been resolved even if she had been permitted to leave her workstation, work under a skylight, or work in the mail room.[16] Whether the new medication that Tegley was prescribed by Dr. Puente near the end of her employment would "break the cycle" of debilitating headaches was unknown at the time the termination decision was made, but Tegley's neurologist had already opined that her prognosis was "quite guarded" and he could not recommend an accommodation except to state that Tegley "will need time off due to her headaches unless they are under better control." Without any evidence to indicate that there was cause to believe in mid-December 2011 that

---

[16] Also, the injections Tegley took at work were not always effective and she could not tell that her condition had improved any after working under the skylight for a month.

Tegley would be able to maintain a regular work schedule after taking 30-60 days of additional leave, she cannot make the required facial showing that a reasonable accommodation was possible.[17] "The nonmoving party may not rely on mere speculation or conjecture" to defeat a motion for summary judgment. *Bayside Holdings*, 709 F.3d at 1228.

### 2. ADA Retaliation

"To establish unlawful retaliation under the ADA, a plaintiff must show that (1) she engaged in a statutorily protected activity, (2) the employer took an adverse action against her, and (3) there was a causal connection between the adverse action and the protected activity." *Hill*, 737 F.3d at 1218. In this case, there simply is no evidence to establish a causal connection between Tegley's requests for an accommodation and her termination.

The evidence does not disclose when, if ever, Tegley complained about not having someone assigned to cover her workstation so she could go in the back to take medication, but her request to work under the skylight was made in March 2011, some 8 or 9 months prior to her termination. The other requests for accommodation (*i.e.*, reassignment to the mail room and additional leave time) were only made after Stebbing had raised the issue of Tegley's disability and scheduled two meetings to discuss possible accommodations. At the first meeting on November 22, 2011, the only accommodation Tegley requested was use of a chainsaw to cut off her head. It was following this meeting, on December 6, 2011, that Stebbing provided notice to

---

[17] Although Tegley states that her migraines "had pretty much subsided by February [2012]," this is not a material fact. "In determining whether a leave request is a reasonable accommodation, the prospect of the employee's recovery from treatment or enablement to return to work should not be judged by hindsight, but rather, by what reasonably appears at the time the leave is requested." *Gibson v. Lafayette Manor, Inc.*, Civil Action No. 05-1082, 2007 WL 951473, *9 n. 16 (W.D.Pa. 2007).

Tegley that he intended to separate her employment because she was unable to perform the essential functions of the job. The second meeting called by Stebbing took place on December 14, 2011.  It was during this meeting that Tegley's attorney and union representative proposed the other accommodations in an attempt to forestall or avoid Tegley's discharge. The mere fact that the termination occurred the next day does not create an inference that the termination was causally linked to the requests for accommodation, which Stebbing had invited.

### III. Conclusion

There is not sufficient direct or indirect evidence of discrimination to establish a claim under the FMLA, nor is there sufficient evidence to establish a claim under the ADA for failure to accommodate or retaliation.  Accordingly,

IT IS ORDERED that the defendant's motion for summary judgment (filing 11) is granted, and final judgment shall be entered by separate document.

DATED this 7th day of July, 2014.

BY THE COURT:

*Richard G. Kopf*
Senior United States District Judge

---

\* This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.